Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission adopts with minor modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner and in a Pre-Trial Agreement as:
 STIPULATIONS
1. The parties are bound by and subject to the North Carolina Workers' Compensation Act.
2. At all relevant times, an employment relationship existed between plaintiff and defendant.
3. Defendant is a duly designated Self-Insured and Hewitt Coleman 
Associates is the servicing agent.
4. Plaintiff's average weekly wage was $265.34.
5. Industrial Commission Forms are stipulated into evidence as Stipulated Exhibit 1.
6. Plaintiff's medical records were stipulated into evidence as Stipulated Exhibit 2.
 *********** EVIDENTIARY RULINGS
The objections raised in the depositions of William A. Huff, M.D., and Robert F. Wilfong, M.D., are OVERRULED.
 ***********
Based upon all the competent evidence adduced at the hearing, the Full Commission enters the following:
 FINDINGS OF FACT
1. At the time of the hearing, plaintiff was 47 years old with a twelfth grade education. Plaintiff began his employment with defendant in 1982 and has worked continuously as a turkey catcher. Plaintiff had previously been employed with Fleming Foods and worked on the dock loading groceries.
2. Plaintiff was employed as a turkey catcher and reported to the Turkey Catching and Hauling Supervisor, John Hall. Plaintiff received $18.50 per load of turkeys.
3. Plaintiff primarily worked at night on a crew with five other loaders and a foreman who did not participate in the actual loading of turkeys. The crew would go to turkey farms and round up and load trucks consisting of 144 crates of turkeys. The turkeys would be transported live from the farm to the slaughterhouse in order to assure delivery of a healthy product.
4. Plaintiff's duties required him to load three different types of turkeys. The first, a belt turkey, weighs 10-12 pounds. A full truckload of belt turkeys consists of approximately 3800 birds (approximately 26 birds per crate). The second type of turkey is a hen, which weighs between 12 and 16 pounds. Approximately 2500 hens made up a full truckload (approximately 16-18 birds per crate). The third type of turkey loaded by plaintiff is a tom which weighs between 25 to 45 pounds. Approximately 1200 toms constitute a full truckload (approximately 8 birds per crate).
5. Upon arrival at a turkey farm, plaintiff and his coworkers would build a plywood pen in which to gather the turkeys, then three men would run the turkeys into the pen. The turkeys in the pen are herded onto a conveyor belt and two men on the other end would load the turkeys into crates by hand. A variety of turkeys were loaded onto each truck. Plaintiff would rotate his position with another worker, running turkeys for one truck, then loading the crates for the next truck. When plaintiff was loading crates at the top of the conveyor belt, he would load half of the crates (72), while the other man at the top of the belt would load the other 72 crates. Plaintiff was not required to physically lift the crates of turkeys.
6. Plaintiff worked five to six nights per week. While the number of truckloads per week varied according to season, in 1999 plaintiff and his crew loaded an average of 29 trucks per week. It takes approximately 40 minutes to load a truck with 144 crates and plaintiff loaded an average of three trucks per night, making the total loading time approximately two hours per night.
7. On June 8, 1999, plaintiff filed a Form 18 indicating that on or about August 3, 1998 he suffered an injury to his neck caused by the "repetitive motion from lifting turkeys."
8. Plaintiff did not indicate to anyone at Carroll's Food that he had any problems relating to his neck prior to filing the Form 18.
9. Plaintiff suffered a prior work-related injury to his right elbow on 8 July 1997. The injury was accepted as compensable and a settlement was reached in June 1999. Plaintiff testified that he resigned from his employment with defendant as part of the settlement agreement.
10. Plaintiff was initially treated for his compensable right elbow injury by his family physician, Dr. Rodney Sessoms. Dr. Sessoms referred plaintiff to Dr. William Huff, an orthopedic surgeon. Plaintiff presented to Dr. Huff on 3 August 1998 with complaints of shoulder and elbow pain for the preceding six or seven months, occasional pain in the base of the neck and occasional numbness and tingling in the right arm. Dr. Huff diagnosed right lateral epicondylitis and right shoulder subacromial impingement, along with probable cervical spondylosis with mild right sided radiculopathy. Dr. Huff gave plaintiff an injection of cortisone and recommended aerobic exercise for the tennis elbow.
11. Plaintiff returned to Dr. Huff on 10 August 1998 stating that he felt better following the injection. His right lateral epicondylitis was resolving and his right shoulder subacromial impingement was stable. Dr. Huff treated plaintiff with medication and recommended physical therapy.
12. Plaintiff continued to treat with Dr. Huff with little improvement. Dr. Huff ordered an MRI which was performed on 18 November 1998. The results indicated that plaintiff had a posterior protrusion of the disc at C5-6 "impinging upon the thecal sac, deforming the cord more so on the right." Dr. Huff diagnosed right sided C5-6 herniated disc with right side radiculopathy. Dr. Huff referred plaintiff to a neurosurgeon.
13. On 22 December 1998, plaintiff presented to retired neurosurgeon, Dr. William Parker, for an evaluation of his cervical complaints. Dr. Parker took a history from plaintiff, which indicated there was no specific history of trauma or unusual activity. Dr. Parker reviewed plaintiff's diagnostic tests and treated him conservatively until March 30, 1999.
14. Dr. Huff also treated plaintiff for some right foot problems which eventually necessitated surgery which was performed by Dr. Huff on 18 January 1999. Plaintiff's foot condition was not related to his employment.
15. On 23 March 1999, Dr. Huff released plaintiff to return to work full time, without restrictions.
16. On 14 April 1999, plaintiff presented to Dr. Robert F. Wilfong complaining of neck pain. Dr. Wilfong's notes of the meeting indicate that plaintiff claimed he was injured "picking up turkey boxes"; however at the hearing before the Deputy Commissioner plaintiff testified that Dr. Wilfong was incorrect and he did not ever lift the crates of turkeys. Dr. Wilfong diagnosed plaintiff with a herniation at C5-6, and recommended an anterior cervical discectomy and fusion.
17. Following the recommended surgery, plaintiff reported improvement to Dr. Wilfong on 13 May 1999; but by October 1999 plaintiff's problems had returned and Dr. Wilfong determined that plaintiff had a nonunion which necessitated a second surgery. The surgery was performed near the end of October 1999. Following the second surgery, plaintiff reported significant improvement in his neck pain and lessened tingling in his hands.
18. Dr. Wilfong was of the opinion that trauma may have caused the herniation at plaintiff's C5-6; however, plaintiff did not report any specific traumatic incident as a direct result of the work assigned that may have caused his herniated disc. Therefore, plaintiff has not proven he suffered an injury by accident arising out of and in the course of his employment.
19. Plaintiff is also claiming he contracted an occupational disease as a result of his employment. Plaintiff's degenerative disc disease and herniated disc are not compensable occupational diseases. While Dr. Wilfong opined that plaintiff's job, by virtue of the physical nature of his duties, may have contributed to the development of his degenerative disc condition, he also stated that every person begins to develop degenerative disc disease at age seven and it progresses throughout life. Plaintiff has not proven and the Full Commission cannot find that the job of turkey catcher caused or contributed to the development of, or placed plaintiff at an increased risk over that of the general public of developing degenerative cervical discs.
20. Dr. Huff was of the opinion that someone who does repetitive lifting of 10 to 50 pounds, moving to the left or right and using the upper extremities would more likely than not be expected to develop degenerative changes in the cervical spine sooner than someone who did not do this type of job. However, Dr. Huff testified that he was not aware of degenerative disc disease or osteophytes causing a herniated disc or making a person more susceptible to disc herniation. Dr. Huff further opined and the Full Commission finds that plaintiff's employment did not cause or significantly contribute to the development of his herniated disc and did not place him at an increased risk of developing a herniated disc.
20. Plaintiff has not proven by the greater weight of the evidence that his herniated disc at C5-6 or his degenerative disc disease are occupational diseases which are due to causes and conditions which are characteristic of and peculiar to his employment or that his employment placed him at a greater risk of contracting these diseases than the general public outside of his employment.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission enters the following:
 CONCLUSIONS OF LAW
1. Plaintiff's neck pain, degenerative cervical spine condition and ruptured or herniated disc at C5-C6 did not arise out of and in the course of plaintiff's employment with defendant, and are not the direct result of a specific traumatic incident of the work assigned. Therefore, plaintiff has not proven an injury by accident. N.C. Gen. Stat. § 97-2(6).
2. Plaintiff has not sustained a compensable occupational disease which was due to causes and conditions which are characteristic of and peculiar to plaintiff's employment with defendant, but excluding all ordinary diseases of life to which the general public is equally exposed outside of plaintiff's employment. N.C. Gen. Stat. § 97-53(13).
3. Plaintiff is not entitled to compensation under the provisions of the North Carolina Workers' Compensation Act. N.C. Gen. Stat. §97-2(6); N.C. Gen. Stat. § 97-53(13).
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Under the law, plaintiff's claim must be, and the same is hereby, DENIED.
2. Each side shall bear its own costs.
This the ___ day of September, 2001.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_______________ LAURA K. MAVRETIC COMMISSIONER
 S/________________ RENE C. RIGGSBEE COMMISSIONER